PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 17-1944 & 17-2024
_____

ADRIAN LUPU

v.

LOAN CITY, LLC; OCWEN LOAN SERVICING, LLC

OCWEN LOAN SERVICING, LLC,

Third-Party Plaintiff

v.

STEWART TITLE GUARANTY COMPANY,

Third-Party Defendant

Stewart Title Guaranty Company
        Appellant (17-1944)

Ocwen Loan Servicing, LLC,
        Appellant (17-2024)

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-12-cv-04556)
District Judge: Honorable Cynthia M. Rufe

————————————

Argued April 24, 2018

Before: MCKEE, AMBRO, and RESTREPO, <u>Circuit Judges</u>

(Opinion filed: September 10, 2018)

Michael P. Coughlin, Esquire (Argued)
Kaplin Stewart Meloff Reiter & Stein
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422

      Counsel for Appellant, Stewart Title Guaranty Co

Kassia Fialkoff, Esquire
Duane Morris LLP
200 South Biscayne Boulevard, Suite 3400
Miami, FL   33312

Brett L. Messinger, Esquire  (Argued)
Brian J. Slipakoff, Esquire
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA  19103

      Counsel for Appellee, Ocwen Loan Servicing LLC

Joshua L. Thomas, Esquire
225 Wilmington-West Chester Pike
Suite 220
Chadds Ford, PA   19317

Counsel for Appellee, Adrian Lupu

—————————

OPINION

—————————

AMBRO, <u>Circuit Judge</u>

What is the duty of a real estate title insurer in Pennsylvania to defend the insured party (here the successor to a lender) against claims of the borrower/mortgagor? Its courts, we predict, would not apply the "in for one, in for all" rule (known also as the complete defense rule)[1]—whereby a single covered claim triggers an obligation for the title insurer to defend the entire action—to a case about that insurer's duty to defend. To identify a covered claim, we apply Pennsylvania's rule that potentially covered claims are identified by "comparing the four corners of the insurance contract to the four corners of the complaint." *American & Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526, 541 (Pa. 2010).

## I.      Background

---

[1] The insured in its briefing used the latter term. As both the District Court and the title insurer refer to the rule by its more colloquial name, we do as well.

3

## A. Adrian Lupu's Refinance Loan and Mortgage

Adrian Lupu, at the time a Pennsylvania homeowner, refinanced his home loan and mortgage with Loan City, LLC. It soon transferred both to IndyMac Bank, FSB, then they went to Fannie Mae, next to OneWest Bank, FSB, and finally to the current holder, Ocwen Loan Servicing, LLC. Stewart Title Guaranty Company provided title insurance. After defaulting, Lupu sued to void the instruments evidencing his debt, the District Court ultimately dismissed his action, and he did not file an appeal. Lupu is not a party to this dispute about who must pay the fees and costs of Ocwen incurred in defending his claims. Nonetheless we need to flesh out the facts underlying the issues before us.

Lupu's action challenged, among other things, the use of the MERS System, a private mortgage registry that allows its members to avoid the need for cumbersome county-level public recordation when transferring mortgage interests. Members do so by designating Mortgage Electronic Registrations Services, Inc., an entity acting as an intermediary, as the holder of record for their mortgages. Although MERS is named as the mortgagee, it does so only as its members' nominee and not as the actual owner; the members retain the beneficial interests in the mortgages. As a result, the members can transfer mortgage interests among themselves without the need to record the assignments. The MERS System tracks those transactions electronically. Because Loan City used the MERS System, the mortgage on Lupu's home and real property identified MERS as the mortgagee of record. Despite Lupu's challenge to the validity of the system, the use of this streamlined recording method is generally in accord with Pennsylvania law. *Montgomery Cty., Pa. v. MERSCORP Inc.*, 795 F.3d 372 (3d Cir. 2015).

If a MERS System member sells a mortgage to a non-member, the mortgage must quit the MERS System by a direct mortgage assignment to the buyer. The transfers from Loan City to IndyMac Bank, and by it to Fannie Mae, all members, were made on the system with MERS remaining the locally recorded mortgage holder. But OneWest Bank is not a member, so it received and recorded a mortgage assignment from MERS. OneWest, in turn, sold the mortgage to Ocwen Loan Servicing, also a non-member, by recorded assignment. The Office of the Recorder of Deeds of Chester County, Pennsylvania has the documents for these last transactions.

### B. The Title Insurance Policy

In connection with Lupu's refinance transaction, Stewart Title insured to Loan City, along with its successors and assignees, the record title of the property (hereafter referred to as the "Title Policy"). It covered against "loss or damage" resulting from, among other things:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

2. Any defect in or lien or encumbrances to the title;

3. Unmarketability of the title;

\* \* \*

5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;

5

6. The priority of any lien or encumbrance over the lien of the insured mortgage;

\* \* \*

9. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens; [and]

\* \* \*

22. Forgery after Date of Policy of any assignment, release or reconveyance (partial or full) of the Insured Mortgage.

Schedule A, to which coverage provisions (1) and (9) refer, describes the property as vesting in "ADRIAN LUPU, AS SOLE OWNER[.]"

For covered claims, the Title Policy requires Stewart Title to "pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the Insured Mortgage, as insured, but only to the extent provided in the Conditions and Stipulations." Those Conditions and Stipulations state that Stewart Title will defend only "those stated causes of action . . . insured against by this policy[]" and not "those causes of action which allege matters not insured against by this policy."

6

### C.  Lupu's Lawsuit

After defaulting on his loan obligations, Lupu filed a *pro se* Complaint to Quiet Title in the Court of Common Pleas of Chester County.  He named Loan City, MERS, Fannie Mae, and some John Does as defendants, but he only served Loan City with the Complaint.  When it did not respond, Lupu moved for and received a default judgment against the entity.  However, Loan City had by then transferred the mortgage to OneWest Bank by a recorded assignment.  After the transfer, Lupu filed a First Amended Complaint, dropping Fannie Mae and MERS as defendants and adding OneWest.  It removed the case to federal court (the Eastern District of Pennsylvania) based on diversity of citizenship.

Once there, Lupu filed a Second Amended Complaint.  Among other things, it alleged that: MERS had been used to "thwart" and "circumvent" Pennsylvania's recording laws, making the loan contract "illegal" and "unenforceable;"  the unrecorded mortgage loan assignments were improper, thus breaking "the chain of title,"  as MERS is merely "an electronic recording entity" and cannot execute an assignment; Loan City fraudulently induced him into the mortgage and loan transaction by failing to inform him that it would transfer the loan and assign the mortgage; and using MERS (instead of the local office of the Recorder of Deeds) to track the mortgage assignments in Pennsylvania was a violation of the Commonwealth's compulsory recording laws and constituted a forgery and fraudulent practice.

OneWest Bank moved for summary judgment, and, in response, Lupu moved to file a Third Amended Complaint, which the Court granted in part to allow three claims.  The first sought enforcement against OneWest, as Loan City's successor, of the default judgment against Loan City on Lupu's initial state-court complaint.  The second claim renewed his

7

objections about MERS being used to skirt the recording laws and the unrecorded transfers breaking the chain of title; in effect, MERS was not the mortgagee and thus did not have the legal "capacity to assign the [m]ortgage" to OneWest. The third claim reasserted Lupu's contention that the use of MERS violates Pennsylvania law. OneWest again moved for summary judgment.

Meanwhile, outside of the Complaint, a new allegation began taking shape. Lupu, now with counsel, responded to interrogatories by asserting that "[t]he original Mortgage . . . signed in front of the Pennsylvania Notary contained signatures of Adrian Lupu and [his wife][2] and was never recorded." Lupu claimed Loan City created mortgage documents using a different notary that had only his signature. He filed his own motion for summary judgment, and, to meet his burden of proof, submitted a certification stating that "the 'recorded mortgage' to MERS/OneWest is not the 'original mortgage' . . . Mr. Lupu and his wife signed at closing."

Considering the Third Amended Complaint, the District Court denied OneWest Bank/Ocwen Loan Servicing's summary judgment motion (the servicer had by then taken the bank's interest in the mortgage). The Court explained, however, that the "only claim remaining in the case" involved Lupu's challenge to "the legitimacy of the recorded mortgage[.]" The lawsuit survived because Lupu's statement in the affidavit raised a factual issue by creating the possibility that Lupu was seeking a "constructive" amendment to the

---

[2] As it turns out, Lupu's fiancée signed the mortgage though record title was only in Lupu's name. In any event, the Title Policy states Mr. Lupu is the property's sole owner, and the refinance note was signed only by him.

Complaint even though its "language . . . did not specifically allege that the mortgage was forged[.]"

It didn't end here. Lupu brought a Fourth Amended Complaint that added Ocwen and Stewart Title as defendants and deleted OneWest. In the facts section he made the forgery allegation to which he had previously referred. He claimed that Loan City created, notarized, and recorded forged mortgage documents "using a different notary from Silver Spring[], [Maryland,] having only Mr. Lupu's signature," and that the original mortgage, therefore, could not have been assigned by Loan City to MERS or ultimately to Ocwen. Among other things, Lupu re-asserted his claim that the unrecorded transfers (using the MERS System) had broken the chain of title. He also sought money damages and entry of default on the ground that Loan City did not timely answer the state court complaint before removal. He sought money damages as well stemming from his allegations that the assignments of his mortgage to, among others, Ocwen were voidable because MERS and the others could not assign it as a result of their lack of authority. Finally, he claimed the failure to disclose the intent to transfer his loan was fraud by deception and clouded the title to his property. Hence Lupu sought, *inter alia*, an order to quiet title and to bar Ocwen from asserting any lien on the mortgaged property.

The District Court found Lupu's allegations unsubstantiated and dismissed with prejudice all of his claims. *Lupu v. Loan City, LLC*, 244 F. Supp. 3d 455, 463 (E.D. Pa. 2017). Lupu did not appeal the ruling.

### D. Ocwen's Third-Party Complaint Seeking Insurance Coverage from Stewart Title

And still the matter was not over. After Ocwen moved for summary judgment on Lupu's Third Amended Complaint,

9

it sought defense coverage by Stewart Title. Ocwen's counsel wrote to Stewart Title that Lupu was pressing a covered claim "to avoid the mortgage on the basis that it was not executed and witnessed correctly." Stewart Title responded that "Lupu's arguments concerned the securitization of the note secured by the insured mortgage and the validity of assignments of the insured mortgage rather than the execution and witnessing of the insured mortgage itself." Ocwen's counsel conceded as much, writing, "We took another look at the Complaint. We agree regarding the allegation of the Complaint." However, the lawyer told Stewart Title he believed, "based on the interrogatories and the recent communication from the borrower (through counsel) before our filing of the Motion for Summary Judgment, it is more likely than not that [the issue of avoiding the mortgage] will be raised in short order."

Lupu then submitted an affidavit alleging the initial lender forged the recorded mortgage, and the Court, while denying the motion for summary judgment, indicated that the only issue remaining was that of the mortgage's legitimacy. In light of this, Ocwen pressed with greater urgency its demand to Stewart Title that the insurer provide a defense, cure the purported title defect, and pay Ocwen for its expenses. But Stewart Title, in a letter to Ocwen, formally denied the claim on the ground that, because "Lupu has not yet alleged the matter in the Complaint," there were no claims "requiring a defense by Stewart Title pursuant to the terms and conditions of the Policy."

In response, Ocwen filed a Third-Party Complaint against Stewart Title alleging breach of contract and bad faith denial of coverage. Stewart Title moved to dismiss, asserting that in Pennsylvania coverage determinations must be entirely based on claims within the "four corners" of the complaint, and the Third Amended Complaint did not allege the mortgage was

invalid because of forgery. The District Court denied the motion, as it believed that at least one of the claims made in the Third Amended Complaint potentially was covered by the Title Policy.

Lupu then filed the Fourth Amended Complaint, making the forgery allegations that he had earlier referenced, and Ocwen again requested Stewart Title's defense. This time Stewart Title agreed to defend Ocwen, but only for the count that claimed the purported deception and fraud clouded Lupu's property's title.

Stewart Title and Ocwen each moved for summary judgment. In Ocwen's cross-motion the company argued that the Title Policy covers the allegations in the Third and Fourth Amended Complaints. Alternatively, it asserted that even if the Title Policy did not cover other counts of the Fourth Amended Complaint, Stewart Title had a duty to defend Ocwen until there were no potentially covered claims remaining in the case.

Considering the cross-motions, the District Court applied the "four corners" rule and held that Stewart Title had no duty to defend the claims in the Third Amended Complaint, but as to the Fourth Amended Complaint applied the "in for one, in for all" rule to hold that, because the title company had a duty to defend against one claim, it had a duty under Pennsylvania law to defend all of the claims in that Complaint. Lupu, 244 F. Supp. 3d at 465-66.

Stewart Title and Ocwen both appealed. The latter contests the Court's application of the "four corners" rule to conclude Stewart Title had no duty to defend the claims in the Third Amended Complaint, and Stewart Title challenges the Court's application of the "in for one, in for all" rule to find it

11

owed a duty to defend the Fourth Amended Complaint in its entirety.

## II.  Standard of Review

As noted, the District Court had diversity jurisdiction 28 U.S.C § 1332.  Our jurisdiction is through 28 U.S.C. § 1291.

We review *de novo* a District Court's grant of summary judgment.  *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (*en banc*).  It is proper if there is no genuine dispute issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)*.*  "In conducting our review, we view the record in the light most favorable to [the non-movant] and draw all reasonable inferences in his favor."  *Nicini, 212 F.3d* at 805-06.

We also determine the applicable state law anew. *Meyer v. CUNA Mut. Ins. Co.*, 648 F.3d 154, 162 (3d. Cir. 2011).

> In the absence of a definitive ruling by a state's highest court, we must predict how that court would rule if faced with the issue.  In so doing, we must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue, as well as to analogous decisions, considered *dicta*, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.

*Id.* at 164 (internal quotations and citations omitted).

## III.  Discussion

12

**A.** **In Pennsylvania, an insurer's duty to defend can be triggered only by an allegation within the four corners of the complaint.**

"[T]he rule everywhere is that the obligation of a causualty [sic] insurance company to defend an action brought against the insured is to be determined solely by the allegations of the complaint in the action[.]" *Wilson v. Md. Cas. Co.*, 105 A.2d 304, 307 (Pa. 1954). With this method, the "question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint." *Jerry's Sport Center*, 2 A.3d at 541. This so-called "four corners" rule is about administrative ease; it ensures courts can "efficiently determine an insurer's duty to defend, which results in less distraction from the merits of the underlying suit." *Water Well Sols. Serv. Grp., Inc. v. Consol. Ins. Co.*, 881 N.W.2d 285, 295 (Wis. 2016). It is also based on the terms of the insurance contract because it does not allow courts to "rewrite the contractual duty to defend to be triggered whenever *any* claim is made rather than only those claims covered under the actual policy terms." *Id.* at 295 n.15 (emphasis in original).

Yet the inflexible application the "four corners" rule allows an insurer to plead Sergeant Schultz's "know nothing" defense, and "thereby successfully ignor[e] true but unpleaded facts within its knowledge that require it, under the insurance policy, to conduct the putative insured's defense." *Associated Indem. Co. v. Ins. Co. of N. Am.*, 386 N.E.2d 529, 536 (Ill. App. Ct. 1979) (footnote omitted). As a consequence, courts in a majority of states have departed from the "four corners" rule in cases where the insurer knows or should know the allegations in the complaint conflict with the facts on the ground. *Water Well Sols.*, 881 N.W.2d at 304 (Bradley, J., dissenting) (collecting cases from 31 states recognizing the exception). The position is that "the insurer cannot use a third party's

pleadings as a shield to avoid its contractual duty to defend its insured." *Fitzpatrick v. Am. Honda Motor Co.*, 575 N.E.2d 90, 90 (N.Y. 1991) (citation omitted). After all, these courts contend, "the duty to defend derives, in the first instance, not from the complaint drafted by a third party, but rather from the insurer's own contract with the insured." *Id.* The alternative approach, it is said, "allows a litigant who is not a party to a contract of insurance to unilaterally control whether . . . the policy provides coverage when that litigant has no privity in the contract." *Water Well Sols.*, 881 N.W.2d at 304 (Bradley, dissenting) (quoting *Water Well Sols. Serv. Grp. Inc. v. Consol. Ins. Co.*, 871 N.W.2d 276, 285 (Wis. Ct. App. 2015) (Reilly, P.J., dissenting)).

Against the tide of this consensus, the Pennsylvania Supreme Court in 2006 declined to adopt an exception to the "four corners" rule. In *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888 (Pa. 2006), the manufacturer of a coke oven battery was sued for breach of contract and/or breach of warranty because the ovens had become cracked, displaced, sheared, and shattered. The manufacturer submitted a claim to its insurer under a commercial liability policy covering "accidents," which in Pennsylvania involve unexpected events. *Id.* at 898. The insurer denied coverage for the faulty workmanship-based claim, the manufacturer sought a declaratory judgment compelling coverage, and the insurer moved for summary judgment. *Id.* at 891-92. In its opposition to the motion, the manufacturer introduced expert reports opining that heavy rains caused the damage—making it a would-be "accident." *Id.* at 892-93. On appeal from the trial court, the Pennsylvania Superior Court found the information from the expert report established a genuine issue of material fact precluding summary judgment. *Id.* at 894.

14

In the Pennsylvania Supreme Court, Kvaerner argued an exception to the "four corners" rule was more protective of policyholders, discouraged artful pleading in the modern "notice" pleading era, and many jurisdictions had adopted it. Brief for Appellees at 61-62, *Kvaerner* (Nos. 47 MAP 2004, 48 MAP 2004), 2004 WL 2615701. But the Supreme Court was not persuaded and held that the Superior Court erred by looking to the expert reports offered by the putative insured rather than studying only the complaint. In doing so, the Supreme Court reaffirmed that the duty to defend is determined "*solely* by the allegations of the complaint." *Kvaerner*, 908 A.2d at 896 (emphasis in original) (quoting *Wilson,* 105 A.2d at 307)**.**

We have repeatedly recognized and applied this well-established precedent. *See, e.g., Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673 (3d Cir. 2016); *Hanover Ins. Co. v. Urban Outfitters, Inc.*, 806 F. 3d 761, 767 (3d Cir. 2016). Moreover, "Pennsylvania courts have identified no exception to the time-honored rule . . . in *Kvaerner*." *Burchick Constr. Co., Inc., v. Harleysville Preferred Ins. Co.*, No. 1051 WDA 2012, 2014 WL 10965436, at *8 (Pa. Super. Ct. 2014) (unpublished). Legal commentators concur. For instance, one source counts Pennsylvania among the states in which "the answer is simple—No. Courts are not permitted to consider extrinsic evidence[.]" Randy Maniloff & Jeffrey Stempel, *General Liability Insurance Coverage: Key Issues In Every State* 69-74, 89 (1st ed. 2011).

Does *Kvaerner* foreclose reliance on the outside facts introduced in the underlying litigation by Lupu, the third-party plaintiff, rather than by the putative insured (Ocwen)? If it does, that is the end of the matter; if it does not, we must predict whether it would—and do no more, as to change Pennsylvania's existing law transcends our purposes. We conclude that *Kvaerner*'s unequivocal holding leaves no room

15

for such a distinction. Indeed, although the Pennsylvania Supreme Court was invited to make an exception to the "four corners" rule, it flatly declined, finding "no reason to expand upon the well-reasoned and long-standing rule that an insurer's duty to defend is triggered, if at all, by the factual averments contained in the complaint itself." *Kvaerner*, 908 A.2d at 896. We thus honor its decision to maintain a simple, bright-line rule.

There is a misfit case—that Ocwen claims is the controlling law—we must address. Curiously, twenty-some years before the Pennsylvania Supreme Court decided *Kvaerner*, the Superior Court recognized an exception to the "four corners" rule that fits the case before us. In that case, *Heffernan & Co. v. Hartford Insurance Co. of America*, 614 A.2d 295 (Pa. Super. Ct. 1992), Heffernan sought insurance coverage for a negligent construction claim against it after a gymnasium roof it built collapsed. *Id.* at 296. The complaint alleged only damage to the building, which the policy did not cover. However, in response to interrogatories, the third-party plaintiff listed damages to the building's contents for which there would be coverage. *Id.* In a declaratory action following the insurer's denial of coverage, the Superior Court held that the information in the interrogatories triggered the duty to defend even though the complaint had not yet been amended to include them. It explained, "Both Heffernan and Hartford are now on notice that a claim for damage to the contents of the building will probably be made in the underlying action. If that occurs, coverage will become clear." *Id.* at 298. It said no more about its holding that knowledge of the likelihood of a covered claim triggers the duty to defend.

What are we to make of this anomalous case? While we must "give due regard" to state intermediate appellate courts, we can be "convinced by other persuasive data that the [Pennsylvania Supreme Court] would decide otherwise."

16

*Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000) (citation and internal quotation marks omitted). Accordingly, we will not look to *Heffernan* as an indication of how the Supreme Court would decide the case before us today. The decision stands practically alone in Pennsylvania; to our knowledge, it is joined only by two unpublished Superior Court opinions. The Pennsylvania Supreme Court has not explicitly overturned the case. However, because it never appended to the "four-corners" rule *Heffernan*'s exception, it is not the law in the Commonwealth. As there is a conflict between *Kvaerner* and *Heffernan*, *Kvaerner* controls, and we must follow it.

Finally, Ocwen complains of the harsh consequences that can be wrought by the "four corners" rule, and no doubt a wooden application leaves would-be insureds in the lurch if a covered claim is not identifiable in the complaint. But Pennsylvania courts tolerate this measure of concern in exchange for a clear rule's benefit. "Put another way, in *Kvaerner*, as in this case, the party seeking insurance was left at the mercy of the [manner] in which the underlying plaintiff opted to pursue its claim." *Burchick*, 2014 WL 10965436, at *8. Because the Pennsylvania Supreme Court has consistently done so for other insureds, we too meet Ocwen's "prayer for relief, however sympathetic, with unflinching fidelity to the traditional rule." *Id.*

In sum, per *Kvaerner*, the seminal case on the issue, we may not look for a covered claim beyond the four corners of Lupu's complaint and how it matches up with the actual terms of the Title Policy. This dispute centers on the Third and Fourth Amended Complaints, to which we turn.

### B. Stewart Title's duty to defend arose after Lupu filed the Fourth Amended Complaint.

Ocwen earlier acknowledged in correspondence with Stewart Title that there were no covered claims on the face of the Third Amended Complaint. The company now argues to the contrary. We agree with the District Court that the Third Amended Complaint, which challenged the MERS System and the post-closing mortgage transfers, does not present any claim under the Title Policy, which generally covers claims that the original mortgage is invalid or forged.

Ocwen contends the insurance provision covering "[f]orgeries after the date of Policy of any assignment . . . of the Insured Mortgage" was triggered by Lupu's calling the mortgage, as assigned, "illegitimate," a "false business record," and a "forgery." But the nature of the factual allegations and claims, not the precise words used, determines whether a duty to defend is triggered. *Roman Mosaic & Tile Co. v. Aetna Cas. & Sur. Co.*, 704 A.2d 665, 668 (Pa. Super. Ct. 1997). Despite Lupu's use of those words, the Third Amended Complaint does not allege a "forgery" of the original mortgage as the parties could have understood that term. Rather, Lupu attacked the well-settled law upholding the practices associated with MERS involvement in the mortgage market. He contended that only the actual holder (and not MERS, the placeholder) could execute an assignment. He challenged the legitimacy of assignments and transfers of the mortgage by MERS because it only acted as "nominee" and was never the actual holder of the mortgage. There is no allegation that an assignment of the mortgage was executed without proper authority or a genuine signature, so there is no forgery claim as to the assignment in the Third Amended Complaint. *See Forgery*, *Black's Law Dictionary* (10th Ed. 2014).

18

Nor does that Complaint allege a claim that the original mortgage is invalid, which would be covered by the Title Policy. Ocwen points to Lupu's prayer for relief. To remedy the allegedly broken chain of title, Lupu asked the District Court to revoke the mortgage and quiet title. Ocwen asks us to construe this prayer as a claim that the original mortgage itself was rendered invalid by the subsequent MERS-assignments, however implausible that scenario is. But in Pennsylvania "the particular cause of action that a complaint pleads is not determinative of whether coverage has been triggered. Instead, it is necessary to look at the factual allegations contained in the complaint." *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999). This avoids "the use of artful pleadings designed to avoid exclusions in liability insurance policies." *Id.* A prayer for relief is not a factual allegation, and Lupu did not plead any facts alleging the invalidity of the original mortgage, so no duty to defend arose. To hold otherwise would involve Stewart Title in defending underlying claims that had nothing to do with the Title Policy.

The duty to defend arose when Lupu filed the Fourth Amended Complaint, including there the forgery allegations he had referred to earlier in response to interrogatories. After Lupu filed the Fourth Amended Complaint, Stewart Title agreed to provide a partial defense and retained counsel. What is left to consider is whether it needed to defend Ocwen against the entire Complaint.

### C. In Pennsylvania, the "in for one, in for all" rule does not apply to cases involving title insurance policies.

Does the "in for one, in for all" rule apply to all aspects of Ocwen's defense to Lupu's Fourth Amended Complaint once Stewart Title agreed to defend Ocwen partially? This issue turns on the difference between title insurance and

19

general liability insurance.  "Title insurance is the business of insuring the record title of real property for persons with some interest in the estate, including owners, occupiers, and lenders." *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 625 (1992).  It is limited, as the "sole object of title insurance is to cover possibilities of loss through defects that may cloud or invalidate titles." *Foehrenbach v. German-Am. Title & Tr. Co.*, 66 A. 561, 563 (Pa. 1907).  It is backward-looking, as the insurer can reduce its exposure to loss before the issuance of the policy by searching the public records.  By contrast, general liability insurance looks forward, as it typically insures against injury occurring because of a future "accident."  *See, e.g., Lords Landing Vill. Condo. Council of Unit Owners v. Cont'l Ins. Co.*, 520 U.S. 893, 894 (1997); *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 598 (3d Cir. 2009); *Kvaerner*, 908 A.2d at 897.

"There is no dispute that, on its face, the Title Policy disclaims a duty . . . to defend non-covered claims."  Ocwen's Br. at 25.  It limits the duty to defend "to those stated causes of action . . . insured against by this policy."  Generally, an insurance policy's plain meaning controls.  *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007).  However, if the disclaimer of duty is contrary to public policy, it is not enforceable in Pennsylvania.  *Nationwide Mut. Ins. Co. v. Riley*, 352 F.3d 804, 807 (3d Cir. 2003); *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006, 1008 (Pa. 1998).

Public policy should seldom be used to upset contractual expectations.  As such, Pennsylvania courts are "reluctant to invalidate a contractual provision due to public policy concerns."  *Williams*, 32 A.3d at 1200.  Put another way, they are "cautious" in light of "the often formless face of public policy."  *Prudential Prop. & Cas. Ins. Co. v. Colbert*, 813 A.2d 747, 752 (Pa. 2002).  They act "only when a given policy is so obviously for or against the public health, safety, morals or

20

welfare that there is a virtual unanimity of opinion[.]" *Mamlin v. Genoe*, 17 A.2d 407, 409 (Pa. 1941).

"Public policy is . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest." *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994) (quoting *Muschany v. United States*, 324 U.S. 49, 66-67 (1945)). To support its public-policy argument, Ocwen points to the "in for one, in for all" rule developed by the common law, which, to repeat, requires an insurer to defend the insured in the entire lawsuit where one claim is within the scope of the coverage even though other claims are not. *See Jerry's Sport Center,* 948 A.2d at 845. By preventing insurers from breaking a case into covered and non-covered pieces, courts avoid the potential waste and impracticality of a bifurcated defense.

No published opinion in Pennsylvania has applied the rule when a title insurance policy is at issue. *See* Ocwen's Br. at 26-27 (not contesting the point). Commonwealth courts have only mandated a complete defense in cases involving general liability insurance policies, which "typically promise to defend the insured in 'a suit' or 'any suit' seeking damages for acts, omissions, or occurrences covered by the policy." *Phila. Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 398 (7th Cir. 2014) (citation omitted). Those policies refer to an entire case. By contrast, title insurers promise to defend only the allegations that "flow from the 'defect' in the title." *Sec. Serv. Inc. v. Transamerica Title Ins. Co.*, 583 P.2d 1217, 1225 (Wash. App. Ct. 1978). As noted, the policy before us covers certain "causes of action" and not others, and therefore expressly contemplates Stewart Title's partial defense of a lawsuit.

The Massachusetts Supreme Court (considering a certified question) and the Seventh Circuit (predicting Illinois

21

law) have concluded that the "in for one, in for all" rule does not apply to title insurers. They reasoned that the rule's central principle—"parsing multiple claims is not feasible"—"is not implicated to the same extent in the title insurance context as in the general liability insurance context." *GMAC Mortgage, LLC, v. First Am. Title Ins. Co.*, 985 N.E.2d 823, 831 (Mass. 2013); *see Phila. Indem. Ins. Co.,* 771 F.3d at 398. That reasoning is apt; title insurance is "fundamentally different" from general liability insurance because (1) the risk covered is limited, specific, and retrospective, (2) the premium is a relatively modest one-time charge, and (3) the duration of coverage is indefinite. *GMAC Mortgage*, 985 N.E.2d at 828-29. To wit, "title issues are discrete, [and] they can be bifurcated fairly easily from related claims." *Id.* at 831.

Brushing off the argument that "disastrous consequences" will follow if parties can contract around the "in for one, in for all" rule, the Seventh Circuit observed "that's just the nature of title insurance; the premiums charged for this form of insurance reflect the limited scope of the coverage." *Phila. Indem. Ins. Co.,* 771 F.3d at 394. Expenses resulting from unexpected title defects comprise a small portion of title insurance premiums; the larger share is used to cover the expense of title research on the insured property. *See* 11A Steven Plitt *et al.*, *Couch on Insurance* § 159:1 (3d ed. 1995). This system is efficient in our decentralized county-recordation title system. "Given the remarkably high exposure represented by policy limits, title insurance premiums are remarkably low." *Id.*

We predict, for the same reasons, that the Pennsylvania Supreme Court would also create a title-policy exception to the "in for one, in for all" rule. Given the unique title insurance context, by doing so it would "consider the language of the policy and the expectation of the insured so as to give reasonable meaning to its terms." *Rood v. Commw. Land Title*

*Ins. Co.*, 936 A.2d 488, 491 (Pa. Super. Ct. 2007) (citation omitted).

As the issue is undecided by the Pennsylvania Supreme Court, the District Court reasoned that it must apply the general rule that "a title insurance policy is subject to the same rules of construction that govern other insurance policies[.]" *Lupu*, 244 F. Supp. 3d at 465 (quoting *Rood*, 936 A.2d at 491, which noted the rule is "general[]"). But the lack of state-law authority creating an exception to the "in for one, in for all" rule does not compel us to define its scope by that general statement. Federal courts, when sitting in diversity, are no ostriches. We do and "often must engage in a substantial amount of conjecture." *Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 273 (3d Cir. 1985). While Pennsylvania courts have not addressed this issue, the reasoning applied in out-of-state cases is sufficient "persuasive data" to convince us of the direction they would go. *Meyer,* 648 F.3d at 164.

There is another reason pushing here opposite the "in for one, in for all" rule. First, title policies are unambiguous that the parties bargained for partial coverage. The industry-standard language in the policy comes from the American Land Title Association, which revised the standard title policy form in 1987 to limit the insurer's obligation "only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy." Earlier model-policies used the term "litigation" instead of "cause of action." 11A Plitt *et al.*, *Couch on Ins.* § 159:1. Given the relatively modest title insurance premium, if we force Stewart Title to cover more than it promised, Ocwen will receive a windfall.

Second, the Pennsylvania Department of Insurance approved the "standard form of policy" before us, which is "used by all title underwriters in Pennsylvania." *Lupu*, 244 F. Supp. 3d at 465. "No policy, endorsement or other coverage

23

may be issued which varies the terms, conditions, stipulations or exclusions of a policy unless first approved by [this] Department." Manual of the Title Insur. Rating Bureau of Pa. § 2.7. Ocwen argues that an executive agency cannot overwrite the common law, *see* Ocwen's Br. at 31 n.11, but we are looking to the agency to see whether such a rule exists in the first place, not to overwrite a rule.

### D. Remand to determine which claims in the Fourth Amended Complaint are covered

The District Court, because it applied the "in for one, in for all" rule, had no occasion to determine which of the claims in the Fourth Amended Complaint are within the scope of the Title Policy. Though it may be but one claim, out of caution we remand to give the Court the opportunity to make the call, and in any event to determine the amount of legal fees and expenses Stewart Title is obligated to cover.

## IV. Conclusion

Pennsylvania's Supreme Court tells us that an insurer's duty to defend turns on the allegations within the four corners of a complaint matched against the terms of the insurance policy. *Kvaerner*, 908 A.2d at 896. We follow suit here in holding that Stewart Title's duty to defend Ocwen against Lupu's claims did not exist until the filing of the Fourth Amended Complaint.

But is Stewart Title bound to defend the entire Complaint? Its Title Policy states that it would not also defend non-covered claims in the action. There was at least one covered claim in the litigation underlying this coverage dispute, and Stewart Title must defend it (or such other claims covered by the Title Policy). Beyond that, however, we hold the parties to their bargain.

24

We thus affirm in part, reverse in part, and remand.