**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1949
_____

NORTHROP GRUMMAN CORPORATION

v.

AXIS REINSURANCE COMPANY; NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA

Axis Reinsurance Company,
                                    Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:17-cv-01738)
District Judge: Honorable Matthew W. Brann
_____

Argued: February 5, 2020

Before: CHAGARES, RESTREPO, and BIBAS, *Circuit Judges*

(Filed:  April 22, 2020)
_____

Kim W. West                        [ARGUED]
Alec H. Boyd
Clyde & Co US
101 Second Street, 24th Floor
San Francisco, CA 94105

Carmella P. Keener
Cooch & Taylor
1007 North Orange Street
The Nemours Building, Suite 1120
P.O. Box 1680
Wilmington, DE 19899

    *Counsel for Appellant Axis Reinsurance Company*


Barry J. Fleishman                 [ARGUED]
Pillsbury Winthrop Shaw Pittman
1200 17th Street, Northwest
Washington, DC 20036

David J. Baldwin
Berger Harris
1105 North Market Street, 11th Floor
Wilmington, DE 19801

    *Counsel for Appellee Northrop Grumman Corporation*


Sean P. Mahoney                    [ARGUED]
Edward M. Koch
Felix S. Yelin
White & Williams
1650 Market Street, Suite 1800
Philadelphia, PA 19103

Timothy S. Martin
White & Williams
600 North King Street, Suite 800
Wilmington, DE 19801

    *Counsel for Appellee National Union Fire Insurance Company of Pittsburgh, Pennsylvania*

_____

OPINION[*]

_____

BIBAS, *Circuit Judge*.

In families, as in insurance disputes, "related" is a relative term. But whether they are twins, other siblings, or cousins, all members of a family are just that: related. In this appeal, we must decide whether one set of allegations against a policyholder in a class action is "related," either causally or logically, to another set in an earlier class action against the same policyholder. If so, then Axis Reinsurance has a duty to defend Northrop Grumman, the policyholder, against the latest lawsuit. If not, that duty falls on National Union Fire Insurance.

Some allegations in the two class actions are like siblings; others are more like cousins. But all of them belong to the same family. Because the District Court correctly concluded that the two class actions are related, we will affirm.

## I. BACKGROUND

### A. The insurance policies

Northrop is a large defense contractor and one of the nation's biggest companies. It offers various retirement plans to its many current and former employees. Collectively, those obligations are substantial: at the end of 2015, for instance, one of Northrop's retirement plans had more than $19 billion in assets and more than 100,000 participants.

_____

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

3

These retirement plans are governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. Under ERISA, Northrop owes strict fiduciary duties to its plan participants. *See id.* §§ 1002(9), (21)(A), 1104(a); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019), *cert. denied*, No. 19-784, 2020 WL 1496631 (U.S. Mar. 30, 2020). Because of these duties, Northrop's retirement plans put it at risk of considerable liability.

To offload some of that risk, Northrop bought several insurance policies that covered claims under ERISA and similar laws. The policies covered Northrop, its plan-management committees, and their members. They included coverage for the costs of Northrop's legal defense and, if it ultimately suffered a covered loss, indemnity for that payout.

In most material respects, Northrop's various insurance policies worked the same way. Take its 2016 policy with National Union, for example. If a party alleged a "Wrongful Act" against Northrop, meaning an "actual or alleged violation" of an employee-benefit law like ERISA, that "Claim" would trigger coverage under the policy. App. 342, 350. Northrop could then submit the "Claim" to National Union, which would have a duty to defend the lawsuit. App. 332. Under that duty, after Northrop paid the first $2.5 million of its defense costs (its self-insured retention), National Union had to fund Northrop's defense of that claim until its "final disposition," even if it was "groundless, false or fraudulent." App. 323, 332–33.

4

## B. The coverage towers

For the years at issue (2006 and 2016), Northrop bought several layered policies with different insurers: a primary policy with National Union and a series of excess policies with other insurers. The excess policies stacked on top of the primary policy and kicked in when the primary policy reached its liability limit. Collectively, they formed a "tower" of coverage for each year, which we will call the 2006 Tower and the 2016 Tower. The terms of the policies explained how coverage responsibility could shift both vertically (among the insurers within one year's tower) and horizontally (from one year's tower to another). *See generally* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 13.14 (19th ed. 2018) (discussing horizontal and vertical interactions).

1. *Liability limits governed vertical shifts.* Under the policies, coverage responsibility would shift vertically among the insurers within the same tower when a policy reached its liability limit. In 2006 and 2016, National Union's primary policies covered the first $15 million in insurable losses, defense costs, and the like. Once those liabilities reached that $15 million limit, the excess policies would kick in, each covering another $15 million tier of liability. In both years, Continental Casualty covered the first tier beyond the primary policy. Axis Reinsurance covered the second tier. To ensure uniformity among the policies within one tower, the excess policies "appli[ed] in conformance with the provisions of" National Union's primary policy, with certain limited exceptions. App. 310, 312.

2. *Two clauses triggered horizontal shifts.* Responsibility could also shift horizontally from one tower to another. Ordinarily, Northrop's coverage would come from the tower of the year the claim was filed. In other words, if a plaintiff sued Northrop in 2016 for a breach

5

of its fiduciary duty under ERISA, Northrop's coverage would typically come from the 2016 Tower.

But responsibility could shift horizontally from the 2016 Tower back to the 2006 Tower if a plaintiff brought a claim in 2016 that was "related" to one filed in 2006. Two provisions in National Union's primary policies worked together to govern these horizontal shifts: the 2016 policy's "prior-notice exclusion" and the 2006 policy's "relation-back clause." The former transferred coverage from one tower to the other; the latter ensured that coverage stayed in the transferee tower.

Here is how these two clauses interacted: The 2016 policy's prior-notice exclusion *disclaimed* coverage for claims "arising out of … the same or *related* Wrongful Act[s] alleged … in any claim which has been reported [for coverage] prior to the inception of this policy." App. 397 (emphasis added). And the 2006 policy's relation-back clause *accepted* coverage for claims "alleging any Wrongful Act which is the same as or *related to* any Wrongful Act alleged in the [first] Claim" by treating the later claim as "*related* to the first Claim and made at the time the first Claim was made." App. 287 (emphases added).

Thus, if a plaintiff sued Northrop in 2016 alleging "Wrongful Act[s]" that were "related" to those alleged in a lawsuit filed against Northrop in 2006, then coverage responsibility for the 2016 lawsuit would shift horizontally to the 2006 Tower. And that shift could, in turn, cause vertical ripples within the 2006 Tower: if, by 2016, National Union's primary tier of coverage in the 2006 Tower had been exhausted, then the excess insurers would become responsible for defending the later lawsuit.

6

## C. The ERISA class actions

Over time, two classes of plaintiffs sued Northrop for breaches of fiduciary duty under ERISA. These suits triggered Northrop's 2006 and 2016 Towers, along with the policy relationships between and within them.

1. *The* Grabek *Action*. In 2006, a group of plan participants including Gary Grabek filed a class action in the Central District of California against Northrop, two of its plan-management committees, and their members. The *Grabek* class included participants in two retirement plans from September 28, 2000 to May 11, 2009. The operative complaint levied three claims relevant here:

- *Fee-capture claim*: The class accused Northrop of overpaying itself for plan-management services that it internalized. Thus, Northrop "captured" the fees for those services, rather than bidding them out to third parties who could provide them more cheaply. The class asserted that Northrop did this out of its own financial self-interest, rather than the plans' best interest, in violation of its duty of loyalty. *See* 29 U.S.C. § 1104(a)(1)(A)(i).

- *Excessive-fees claim*: The class alleged that even when Northrop did outsource plan-management functions, it failed to set the rates for those services prudently, instead letting third parties bill the plans at above-market rates. The class alleged that this violated Northrop's duty of care. *See id.* § 1104(a)(1)(B).

- *Pay-for-play claim*: The class also accused Northrop of disloyally selecting certain investment managers for the plans at issue because those managers gave Northrop preferential discounts on other plans.

Roughly a decade into this litigation, the class discovered even more alleged wrongdoing. But those allegations reached beyond the class and discovery periods, both of which ended in 2009. So when the class moved for discovery on that wrongdoing, the court denied its motion, citing the "dramatic" prejudice to Northrop of eleventh-hour discovery.

7

App. 644. The court thus reaffirmed that the *Grabek* action did not extend to misconduct that took place after May 2009.

After Northrop filed a claim for coverage of the *Grabek* Action, National Union covered Northrop's defense costs under the 2006 Tower. Eventually, those costs exceeded Northrop's $2.5 million self-insured retention and National Union's $15 million liability limit. That triggered the excess policies, starting first with Continental's. When Northrop later settled the *Grabek* Action, the combined cost of the defense and that settlement exceeded the $15 million cap on Continental's excess policy. So coverage responsibility shifted vertically to Axis, putting it on the hook for the next $15 million in liabilities assigned to the 2006 Tower.

2. *The* Marshall *Action.* In response to the district court's ruling limiting the scope of the *Grabek* Action, the lawyers representing that class filed another class action in the same court and before the same district judge (the *Marshall* Action). The *Marshall* Action brought the claims that the class could not raise in the *Grabek* Action.

The *Marshall* Action was different in a few ways. First, because of the order limiting the temporal scope of the *Grabek* Action, the class periods were not the same: the *Marshall* Action concerned wrongdoing beginning sixteen months after the *Grabek* class period ended. Second, the individual defendants changed because the membership of Northrop's plan-management committees had changed over time. Third, the *Marshall* class was narrower than the *Grabek* class because the *Marshall* Action concerned only one of the two retirement plans at issue in *Grabek*.

In addition, because the *Marshall* complaint had the benefit of a decade's worth of discovery from the *Grabek* Action, its allegations were much more particularized. The operative *Marshall* complaint brought three claims:

- *Fee-capture claim*: The *Marshall* class accused Northrop of overpaying itself for internally managed administrative services rather than bidding them out to more cost-efficient third parties.

- *Active-management claim*: The class also alleged that Northrop had mismanaged a particular fund, the Emerging Markets Equity Fund, in which the plan's participants could invest. The class claimed that Northrop kept using a costly "active" manager even though cheaper and better-performing "passive" managers were available.

- *Recordkeeping-fees claim*: The class alleged that Northrop had overpaid a particular third party for the plan's recordkeeping services. It alleged that cheaper alternatives were available, but that Northrop had failed to engage in competitive bidding for those services, violating its duty of care.

Eventually, Northrop and the *Marshall* class reached an initial settlement. The Central District of California preliminarily approved that settlement in February 2020 and ordered counsel to send out notices to the class for approval. That court has yet to enter a final settlement.

### D. This coverage action

After the *Marshall* Action was filed, Northrop filed a claim with National Union for coverage under the 2016 Tower. In response, National Union disclaimed coverage. It argued that the "factual relationship" between the wrongful acts alleged in the two actions triggered the 2016 policy's prior-notice exclusion and the 2006 policy's relation-back clause. App. 833–36. Thus, National Union asserted, coverage responsibility shifted horizontally to the 2006 Tower, for which Axis was now responsible due to vertical exhaustion.

So Northrop tried again. It filed a claim with Axis, asking it to defend the *Marshall* Action. Disagreeing with National Union, Axis also disclaimed coverage. It read the prior-notice exclusion and the relation-back clause differently.

This left Northrop exposed. With both insurers refusing coverage, it had to defend the *Marshall* Action out of pocket. To resolve the quarrel between the insurers, Northrop sued them both in the District of Delaware. It sought a declaration that one of them was responsible for defending the *Marshall* Action and an order compelling that insurer to pay Northrop's past and future defense costs. Both insurers answered the complaint and cross-claimed against each other for a declaration affirming the other's obligation to defend the *Marshall* Action. All the parties then cross-moved for summary judgment.

The District Court granted in part Northrop's and National Union's summary-judgment motions against Axis and ordered it to defend the *Marshall* Action. *Northrop Grumman Corp. v. AXIS Reins. Co.*, No. 1:17-cv-01738, 2018 WL 5314918, at *1 (D. Del. Oct. 26, 2018). The court construed the term "related" broadly in both the prior-notice exclusion and the relation-back clause, understanding it to encompass causal or logical connections. *Id.* at *3. Under that standard, the court found that "*Marshall* and *Grabek* alleged related Wrongful Acts." *Id.* at *4. So it ruled that "Northrop Grumman's claim for coverage of the *Marshall* action should … be considered made at the time Northrop Grumman made its claim for coverage of the *Grabek* action—*i.e.*, during the 2006–2007 policy year." *Id.* The court thus ordered Axis to compensate Northrop for its existing defense costs and to defend the *Marshall* Action going forward until it exhausted its $15 million liability limit.

10

## E. This appeal

Axis now appeals the District Court's grant of summary judgment to Northrop and National Union and the denial of its own summary-judgment motion. "We review the grant or denial of summary judgment de novo." *Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 708 (3d Cir. 2019).

After filing its appeal, Axis agreed to "exhaust[ ] its 2006–07 policy limits by contributing toward the *Marshall* settlement." C.A. Dkt. No. 83. Because it did so "under reservation of rights, including the right to recoup [those costs] pending the outcome of th[is] appeal," that agreement does not moot this case. *Id.*; *see, e.g.*, *Wilcher v. City of Wilmington*, 139 F.3d 366, 370 n.2 (3d Cir. 1998).

In this appeal, we need resolve only whether Axis has a duty to defend Northrop. We need not and do not decide whether it has a duty to indemnify, for two reasons: First, the judgment from which Axis appeals imposed only a duty to defend the *Marshall* Action. *See* App. 4–5 (entering judgment against Axis on Northrop's Count III and National Union's cross-claim). Second, the question of indemnification is not yet ripe; Northrop has yet to suffer any indemnifiable losses because the Central District of California has not entered a final settlement in the *Marshall* Action. Courts usually refrain from deciding whether an insurer must indemnify the insured until after the insured is found liable for damages in the underlying action. *See, e.g.*, *Evanston Ins. Co. v. Layne Thomas Builders, Inc.*, 635 F. Supp. 2d 348, 353 (D. Del. 2009) (discussing *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647–48 (3d Cir. 1990)).

## II. The Term "Related" Encompasses Both
## Causal and Logical Connections

The issue here is whether the *Marshall* Action alleges wrongful acts that are "related" to those alleged in the *Grabek* Action. If they are related, then the *Marshall* claims trigger the 2016 Tower's prior-notice exclusion and the 2006 Tower's relation-back clause, shifting the duty to defend that action to Axis under its 2006 excess policy. If they are unrelated, then the duty to defend remains with National Union under its 2016 primary policy.

Our analysis hinges on the term "related." Because we must interpret the policies to decide the term's scope, we look to state law. *Ruhlin v. N.Y. Life Ins. Co.*, 304 U.S. 202, 205 (1938). As we explain below, the relevant states construe that term broadly, embracing both causal and logical relationships.

### A. California and Virginia law govern this dispute

At the outset, we determine which states' laws apply. To do that, we apply the choice-of-law rules of Delaware, the forum state. *See, e.g.*, *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 403 (3d Cir. 2016). In insurance-policy disputes, Delaware applies the "most significant relationship" test. *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017) (citing Restatement (Second) of Conflict of Laws (Am. Law. Inst. 1971)). When multijurisdictional policies like Northrop's are at issue, the state in which the insured is headquartered weighs heavily in determining which state has the most significant relationship to the dispute. *See id.* at 460 (applying New York law "in particular as the headquarters of the insured" was there).

12

Because Northrop's headquarters moved during the period at issue, California law governs the 2006 Tower and Virginia law governs the 2016 Tower. Thus, California law governs the relation-back clause while Virginia law governs the prior-notice exclusion.

Fortunately, we need not parse finely the application of either state's laws. The parties agree that California and Virginia law do not conflict materially on the relevant issues. When there is no "true conflict," we "may refer interchangeably to the laws of the states whose laws potentially apply." *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006). So we will apply California and Virginia law interchangeably to both towers.

## B. Both states construe the term "related" broadly

When construing insurance policies, both the Golden State and Old Dominion interpret the text based on its plain meaning. *See, e.g.*, *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 627 (Cal. 1995); *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012). The ordinary meaning of "related" is unambiguously broad in scope. *See, e.g.*, *Related*, *Black's Law Dictionary* (11th ed. 2019) ("[c]onnected in some way"); *Related*, *Oxford English Dictionary* (3d ed. 2009) ("Connected or having relation to something else."); *accord Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

Both states have adopted that expansive reading. Under California law, "the term 'related' as it is commonly understood and used encompasses both logical and causal connections." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1274 (Cal. 1993); *see id.* ("'[R]elated' is not ambiguous and is not limited only to causally related acts."). Still, California law recognizes that the term does not "encompass every conceivable logical relationship." *Id.* at 1275. "At some point, a relationship between two

13

claims, though perhaps 'logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy." *Id.*

Likewise, Virginia law recognizes that the term related is "very broad in its coverage," embracing diverse connections. *Brush Arbor Home Constr., LLC v. Alexander*, 823 S.E.2d 249, 251 (Va. 2019) (internal quotation marks omitted). And while Virginia courts have yet to hold specifically that the term "related" includes both causal and logical ties, Axis and National Union each conceded at oral argument that Virginia's approach does not conflict with California's. Plus, our sister circuits have adopted this causal-and-logical approach too (though under other states' laws). *See Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262–63 (11th Cir. 2000) (per curiam); *Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989). We will do the same here.

Thus, to determine whether the wrongful acts alleged in *Marshall* relate to those alleged in *Grabek*, we review the record for a causal or a logical relationship.

### III. ALL THE WRONGFUL ACTS ALLEGED IN *MARSHALL* RELATE TO THOSE ALLEGED IN *GRABEK*

In the duty-to-defend posture, our review is strictly textual: we look to the policies' text and to each action's complaint to figure out whether the *Marshall* Action relates to the *Grabek* Action. Our review confirms that each of the wrongful acts alleged in *Marshall* relates to a wrongful act alleged in *Grabek*.

**A. The "four corners" rule narrows our review**

To decide whether an insurer owes a duty to defend, we apply the "four corners" rule (sometimes called the "eight corners" rule). *Lupu v. Loan City, LLC*, 903 F.3d 382, 389 (3d Cir. 2018); *AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 535 (Va. 2012). That rule limits our review to allegations within the four corners of the operative complaints in the liability actions and the four corners of the insurance policies. *AES Corp.*, 725 S.E.2d at 535.

The parties agree that the four-corners rule applies. And the insurance policies confirm its applicability: each defines the term "Claim" by referring to a written document alleging wrongful behavior, like a civil complaint.

Even so, Axis and National Union argue that various statements made by the litigants and the district judge in the *Marshall* and *Grabek* Actions bear on the relatedness of the claims. But those statements fall beyond the four corners of the complaints and the policies. So we will not consider them in deciding which insurer must defend the *Marshall* Action. Even if we did, these cherry-picked statements from a decade's worth of litigation are hardly reliable indicators of relatedness.

Thus, to decide whether the two actions allege related wrongful acts, we compare each of the complaints and the insurance policies. Because the *Marshall* complaint is narrower and more particularized, we consider whether its claims are a subset of *Grabek*'s. To do that, we focus on three factors rooted in the text of the allegations: *what* went wrong, *who* did it, and *when*. *See Bay Cities Paving*, 855 P.2d at 1274 (assessing relatedness by looking

15

to the nature of the injury, the identity of the actors, and the alleged wrongdoing). We address each factor in turn.

**B. Each of the wrongful acts alleged in *Marshall* relates to those alleged in *Grabek***

Our review confirms that each of the *Marshall* Action's three claims alleges wrongful acts that relate to those alleged in the *Grabek* Action.

1. *The fee-capture claims are nearly identical.* The *Marshall* Action's fee-capture claim is nearly identical to the *Grabek* Action's fee-capture claim.

The *Marshall* complaint alleges that Northrop "hire[d] itself" to provide "administrative services," without ensuring that its fees "were reasonable and that the quality of the services and the amount of the charges were equivalent to what an independent third party would charge." App. 794–95. The class claimed that Northrop "did not put the[se] services … out for competitive bidding to determine the market rate for such services." App. 796. So the defendants "allowed Northrop to receive Plan assets in the guise of compensation that was not reasonable or necessary for the administration of the Plan." *Id.*

The *Grabek* complaint similarly alleged that the plans' fees were "excessive" because of: (1) "the high fees paid to Northrop for administrative services it provided"; (2) the defendants' failure "to bring these administrative costs in line with market rates"; and (3) the fact that these services "could have been more effectively outsourced consistent with the practices of prudent fiduciaries." App. 493–94.

The text of the complaints reveals a clear logical and causal relationship between the two claims: both allege the same self-interested wrongdoing, through the same practices, causing the same harm.

16

2. *The active-management claim relates to the excessive-fees claim.* A close examination of *Marshall*'s active-management claim shows its roots in *Grabek*'s excessive-fees claim. The former alleges that Northrop mismanaged its Emerging Markets Equity Fund by continuing to retain an active investment manager. This decision, the class argued, caused two harms: the fund "underperformed lower-cost passively managed alternatives," and it paid "$12 million [more] in unreasonable investment management fees compared to lower-cost passively managed alternatives." App. 803–04.

Both of these allegations relate causally and logically to *Grabek*'s excessive-fees claim. That claim alleged that Northrop generally overpaid third parties for plan-management services. Among those allegations, the *Grabek* class claimed specifically that several funds—including the same Emerging Markets Equity Fund—"charged excessive investment management fees," yet still "failed to meet their stated performance objectives" by "fail[ing] to outperform … their relevant benchmarks." App. 491–92. And the *Grabek* class accused Northrop of breaching its duty of care by "continu[ing] to hire and retain excessively expensive investment managers" even though "far less expensive passive management[] w[as] readily available." App. 493. Once again, the text shows a causal and logical connection between the two claims: both complain that Northrop made poor fund-management decisions that led to increased fees and hampered fund performance.

3. *The recordkeeping-fees claim is a type of excessive-fees claim.* The closest call of the three is the recordkeeping-fees claim. Still, a careful review of each complaint reveals that *Marshall*'s recordkeeping-fees claim is a causal and logical subset of *Grabek*'s excessive-fees claim.

17

The crux of *Marshall*'s recordkeeping-fees claim is that Northrop overpaid a third party that provided recordkeeping services for one of its plans. The *Marshall* class alleged that the market for those services is "highly competitive" because "every" plan needs record-keeping. App. 797. But, the class asserted, Northrop "pa[id] unreasonable administrative expenses to [that entity]" because it failed to "engage an independent third party to bench-mark the reasonableness" of those fees and "failed to conduct a competitive bidding pro-cess" for those services in the relevant period. App. 799–800. The class also maintained that Northrop's recordkeeping fees were unusual: they rose with the amount of assets under management when they should have dropped, on a percentage basis, as the number of plan participants increased.

Those allegations relate to the *Grabek* Action's excessive-fees claim, which alleged that Northrop's third-party fees "were excessive and unreasonable when compared to the market rate[s] … [and] to known and readily available alternatives." App. 491. It further alleged that Northrop's external fees remained stubbornly high even though "[i]ndustry studies" showed that those fees should have "decline[d]" as a "percentage of assets … as asset size increase[d]." *Id.*

Thus, a close review of the text reveals the causal and logical connections between the *Marshall* Action's recordkeeping-fees claim and the *Grabek* Action's excessive-fees claim. Both concern the same kind of wrongdoing: a failure to monitor and limit third-party fees prudently.

4. *Axis's counterargument misses the mark.* Axis argues that the active-management and recordkeeping-fees claims are unrelated to any of the claims in the *Grabek* Action. This argument fails because it misconstrues the *Grabek* complaint's scope.

Axis argues that the *Grabek* complaint contains only the fee-capture claim (which it calls the "2000–2009 Excessive Fee Claim") and the pay-for-play claim. Appellant's Br. 10–11. It concedes that the two complaints allege common wrongdoing related to Northrop's internal fees. But it argues that *Marshall*'s active-management and recordkeeping-fees claims are unrelated either to Northrop's internal fees or to the pay-for-play claim. Thus, it maintains, these two claims are unrelated to any levied in the *Grabek* Action.

To be sure, neither of *Marshall*'s duty-of-care claims relates to *Grabek*'s pay-for-play claim, which is a duty-of-loyalty claim. Still, this argument falls flat. It reads too narrowly the *Grabek* complaint's allegations about Northrop's failure to prudently control the internal *and external* fees that it charged the plans. Indeed, what Axis calls the "2000–2009 Excessive Fee Claim" is really two claims: the internal fee-capture claim and the external excessive-fees claim. *Compare id.*, *with* App. 491 (alleging that the plans paid "excessive and unreasonable" fees both to Northrop *and* to third parties). Because Axis's reading omits the portion of this claim that relates to third-party expenses, its counterargument falls short.

In sum, each of the wrongful acts alleged in the *Marshall* Action relates—both causally and logically—to one of the wrongful acts alleged in the *Grabek* Action.

19

**C. The parties in each action overlap substantially**

We next consider the commonality between the parties in the two actions. We find a considerable overlap for each.

1. *The* Marshall *class is largely a subset of the* Grabek *class.* We evaluate this subfactor on two axes: overlap in plans and overlap in time periods. Both show substantial commonality.

First, the classes overlap in the plans to which they belonged. The *Marshall* class members were participants in one of the two retirement plans at issue in *Grabek*. So the two are logically related because the former is largely a subset of the latter.

Second, the classes also overlap in time. Despite a sixteen-month gap between the two actions' class periods, the District Court correctly found it "likely" that there was "a very large overlap between members of the [two] classes." 2018 WL 5314918, at *3. True, it is likely that some number of *Grabek* class members were no longer plan participants when the *Marshall* Action was filed, and that some *Marshall* class members were not yet eligible to participate in a plan during the earlier *Grabek* class period. But the plans at issue are defined-benefit plans (also called 401(k) plans), which are vehicles for long-term financial savings. So it is likely that many participants kept their money invested the whole time.

2. *The defendants overlap substantially too.* We also evaluate this subfactor on two axes: the corporate defendants and the individual defendants. The overlap in the former overcomes the differences in the latter.

For the corporate defendants, the overlap is complete: each class sued Northrop and its two committees responsible for plan management. For the individual defendants, it is true

20

that none is named in both actions. But the classes allege wrongdoing over more than a decade. And ERISA limits personal liability to the periods in which the defendant was a fiduciary. *See* 29 U.S.C. § 1109(b). So an exact match is unnecessary. In any case, the defendants' names are less relevant than their official capacities. In both actions, each of the defendants served on one of the two committees at issue. So their official capacities overlap.

In sum, there is a significant overlap between both the plaintiffs and the defendants in the two actions. That shows a logical relation between them.

**D. A common, continuing breach bridges the temporal gap between the actions**

Lastly, we consider the timing of the alleged wrongs. At first glance, this factor appears to cut against the actions' relatedness because a sixteen-month gap separates their class periods. But when two actions concern a continuing breach, or a "single course of conduct," this bridges the temporal gap between them. *Cont'l Cas. Co.*, 205 F.3d at 1264. That is what happened here: as discussed, the *Marshall* Action concerns wrongful acts that began during the *Grabek* class period and whose causal and logical descendants continued into the *Marshall* class period. So this factor favors relatedness too.

**E. Axis must thus defend the *Marshall* Action**

In short, the "what," "who," and "when" of the *Marshall* and *Grabek* Actions overlap considerably. We thus conclude that under the 2016 policy's prior-notice exclusion and the 2006 policy's relation-back clause, the claims alleged in the *Marshall* Action are causally or logically related to those in the *Grabek* Action. So the duty to defend the *Marshall* Action shifts horizontally from the 2016 Tower to the 2006 Tower, and then vertically to

21

Axis's excess tier. We will thus affirm the District Court's judgment requiring Axis to defend the *Marshall* Action.

In reaching this result, we need not decide which insurer would be on the hook if only a subset of the claims were related. Thus, we need not discuss any differences between the duty to defend and the duty to "advance defense costs." *See* Appellant's Br. 47–50; Reply Br. 15–18.

* * * * *

Some relatives are more closely related than others. But all branches of a family tree share the same roots. Here, each of the wrongful acts alleged in the *Marshall* Action is rooted in those alleged in the *Grabek* Action: the fee-capture claims are siblings (if not twins), the active-management claim is a first cousin of the excessive-fees claim, and the recordkeeping-fees claim is a second cousin of the excessive-fees claim. Even so, all these claims are causally or logically related. So we will affirm the District Court's judgment requiring Axis to defend those claims under its 2006 excess policy.